## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jun 12 2020, 7:02 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ernest P. Galos
Public Defender
South Bend, Indiana

ATTORNEY FOR APPELLEE

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

J.C.,

*Appellant-Respondent,*

v.

State of Indiana,

*Appellee-Petitioner.*

June 12, 2020

Court of Appeals Case No.
19A-JV-2636

Appeal from the St. Joseph Probate Court

The Honorable Graham C. Polando, Magistrate

Trial Court Cause Nos.
71J01-1605-JD-137
71J01-1608-JD-230
71J01-1609-JD-274
71J01-1610-JD-336
71J01-1702-JD-68
71J01-1808-JD-278

**Pyle, Judge.**

# Statement of the Case

J.C. ("J.C. ")—following his admission in six separate juvenile proceedings that he had committed acts that would constitute Class A misdemeanor theft, Class A misdemeanor battery resulting in bodily injury, two acts of Class B misdemeanor battery, three acts of Class B misdemeanor criminal mischief, and Class B misdemeanor criminal recklessness if committed by an adult—appeals the juvenile court's modified disposition orders awarding wardship to the Indiana Department of Correction with placement at a juvenile facility. Concluding that the juvenile court did not abuse its discretion by modifying the disposition orders, we affirm the juvenile court's modified disposition orders in the six juvenile proceedings.

We affirm.

# Issue

Whether the juvenile court abused its discretion by modifying the dispositional orders to award wardship of J.C. to the Department of Correction.

# Facts

This appeal involves J.C.'s six different juvenile proceedings in which delinquency petitions were filed during a span of two years. In May 2016, the State filed the first delinquency petition, under cause number 71J01-1605-JD-137, alleging that thirteen-year-old J.C. was a delinquent child for committing an act that would constitute Class A misdemeanor theft if committed by an adult ("Case #1") for J.C.'s act of stealing a cell phone from another person. In

July 2016, J.C. admitted to the delinquency allegation, and the juvenile court placed J.C. on "Strict and Indefinite Probation[.]" (App. Vol. 3 at 19).

[4] Shortly thereafter, in August 2016, the State filed a second delinquency petition, under cause number 71J01-1608-JD-230, alleging that J.C. was a delinquent child for committing an act that would constitute Class B misdemeanor battery if committed by an adult ("Case #2"). J.C. admitted to the delinquency allegation, and the juvenile court continued him on the conditions of probation as in Case #1. The juvenile court also placed J.C. on home detention for sixty (60) days.

[5] In September 2016, the State filed a third delinquency petition, under cause number 71J01-1609-JD-274, alleging that J.C. was a delinquent child for committing an act that would constitute Class B misdemeanor battery if committed by an adult ("Case #3") for striking another child on the school bus. After J.C. admitted to the delinquency allegation, the juvenile court continued J.C. on probation and ordered that he be placed on electronic home monitoring for thirty (30) days.

[6] In October 2016, the State filed a fourth delinquency petition, under cause number 71J01-1610-JD-336, alleging that J.C. was a delinquent child for committing acts that would constitute Class B misdemeanor criminal mischief and Class B misdemeanor criminal recklessness if committed by an adult ("Case #4"). Specifically, J.C. was alleged to have caused property damage and was alleged to have thrown a vase at his mother, creating a substantial risk

of bodily injury. J.C. admitted to the allegations. In December 2016, the juvenile court ordered J.C. to comply with the terms of probation in Cases #1-3 and to remain on home detention for thirty (30) days.

[7] Approximately two weeks later, in mid-December 2016, the probation department filed a modification report, indicating that J.C. had violated home detention rules. Specifically, J.C. had smashed the phone, cursed out his mother, put his hands on his sister, and punched holes in the walls and doors at his house. The juvenile court entered a modification order and committed J.C. to the Juvenile Justice Center for thirty (30) days with five (5) days to be served and twenty-five (25) days suspended. The juvenile court also continued J.C. on probation and home detention for up to sixty (60) days.

[8] In February 2017, the State filed a fifth delinquency petition, under cause number 71J01-1702-JD-68, alleging that fourteen-year-old J.C. was a delinquent child for committing an act that would constitute Class B misdemeanor criminal mischief if committed by an adult ("Case #5"). J.C. admitted to the allegation that he had punched his mother's walls and caused damage. The probation department filed a modification report, setting out numerous examples of J.C.'s history of aggressive behavior dating back to 2014. The probation department also noted that, in January 2016, J.C. had had a psychiatric evaluation, which had indicated that J.C. had been diagnosed with conduct disorder, disruptive mood dysregulation disorder, mild intellectual disability, and learning and language disorders. Given J.C.'s history and continued aggressive behaviors, the probation department recommended that

J.C. be placed at a "residential treatment program at Campagna Academy - DD/ID program" to help "manage his behavior problems and address his mental health needs." (App. Vol. 4 at 45). In March 2017, the juvenile court followed the probation department's recommendation and ordered J.C. to be placed at Campagna Academy in Lake County. The court ordered J.C. to "participate and successfully complete placement and [to] follow all rules and regulations" and warned him that his "[f]ailure to do such may result in immediate detention." (App. Vol. 4 at 45).

[9] J.C. remained in Campagna Academy for the remainder of 2017 and part of 2018. In July 2018, the State filed a petition in Lake County, under cause number 45D06-1807-JD-384, alleging that fifteen-year-old J.C. was a delinquent child for committing acts, while at Campagna Academy, that would constitute: (1) Level 6 felony battery by bodily waste for spitting on a police officer; (2) Class A misdemeanor resisting law enforcement; (3) Class B misdemeanor criminal mischief for damaging a car; and (4) Class B misdemeanor disorderly conduct if committed by an adult. In August 2018, J.C. admitted to two of the allegations; specifically, he admitted to an amended allegation of Class A misdemeanor battery resulting in bodily injury and to Class B misdemeanor criminal mischief. The case was then transferred to St. Joseph County, where it was then filed under cause number 71J01-1808-JD-278 ("Case #6"). In September 2018, the juvenile court ordered that J.C. be released from Campagna Academy and placed at Damar.

[10]  On March 12, 2019, the juvenile court held a review hearing on Cases #1-6. The juvenile court ordered J.C. to be discharged from Damar, following his completion of the multi-month program. The juvenile court released J.C. on the "Home Detention Trust House Arrest Program" and to the custody of his mother. (App. Vol. 3 at 60).

[11]  The following month, on April 17, 2019, the probation department filed a modification report, stating that since J.C.'s release from Damar, he had exhibited aggressive behavior at home, including fighting with his brother, damaging a door, and making "aggressive statements[.]" (App. Vol. 3 at 62). J.C.'s mother had reported the incidents to the probation department instead of calling the police. The probation department opined that J.C. needed intensive treatment and noted that Damar had an opening at that time and was willing to readmit J.C. J.C.'s mother, however, had stated that she wanted to wait until June to see if J.C. could adjust his behavior. The probation department recommended that J.C. be placed at Damar and noted that "harsher" recommendations may occur if J.C.'s placement was postponed until June. (App. Vol. 3 at 62). The juvenile court denied without prejudice the State's modification request to place J.C. at Damar.

[12]  On June 12, 2019, the probation department filed a probation status report in preparation for a June 18, 2019 status hearing. The report indicated that J.C.'s relationship with his family "continued to be irritable." (App. Vol. 3 at 75). The probation department also stated that it had met regularly with J.C. and had provided him with "intensive" outpatient services, including individual

therapy, to assist him in processing issues before they would "get[] out of control." (App. Vol. 3 at 75). Additionally, the probation department stated that it had "exhausted all possible services, short of another request for residential placement." (App. Vol. 3 at 75). The report, however, cautioned that "[d]ue to [J.C.'s] age, history of aggressive behavior, and the efforts provided, if any further delinquent behaviors were to occur, [J.C.] may not have the opportunity for further residential placement." (App. Vol. 3 at 75). Because of these factors, the probation department recommended that J.C. be successfully discharged from formal probation.

[13]     A few days later, on June 17, 2019, the probation department filed an additional probation status report, indicating that sixteen-year-old J.C. had been taken that day into the Juvenile Justice Center based on the allegation that he had committed "new delinquent offense(s)[.]" (App. Vol. 3 at 77). Specifically, J.C. was alleged to have committed Class A misdemeanor domestic battery and Level 5 felony intimidation. Based on these new circumstances, the probation department informed the juvenile court that the recommendation in its previous status report should be "disregarded[.]" (App. Vol. 3 at 77).

[14]     That same day, the probation department filed a modification report, summarizing the pendency of J.C.'s probation, which had begun in July 2016. The report also discussed J.C.'s two residential treatment placements, one of which was modified because of J.C.'s "deteriorating behaviors[,]" and his "continued aggressive behavior" since he had returned home despite having "intensive outpatient services[.]" (App. Vol. 2 at 81, 82). The probation

department also noted that J.C.'s most recent domestic battery allegation "add[ed] to his list of delinquencies that involve[d] physical aggression." (App. Vol. 2 at 82). The probation department recommended that J.C.'s placement be modified and that wardship of J.C. be awarded to the Department of Correction with placement at Indiana Boys School.

[15] The juvenile court held a modification and review hearing on June 18, 2019 and then an additional modification hearing on August 20, 2019. At the end of the August hearing, the juvenile court noted that "the Court ha[d] tried pretty much everything. It[] tried home. It[] tried Campagna. It[] tried Damar. It[] tried home again, and the only constant ha[d] been [J.C.'s] behavior[.]" (Tr. Vol. 2 at 52). The juvenile court modified the disposition orders in Cases #1-6 and awarded wardship of J.C. to the Department of Correction with placement at a juvenile facility. J.C. now appeals.

# Decision

[16] J.C. argues that the juvenile court abused its discretion by modifying his disposition. We disagree.

[17] The choice of the specific disposition of a juvenile adjudicated a delinquent child is a matter within the sound discretion of the juvenile court subject to the statutory considerations of the welfare of the child, the safety of the community, and the policy of favoring the least harsh disposition. *J.S. v. State*, 881 N.E.2d 26, 28 (Ind. Ct. App. 2008). A juvenile disposition will not be reversed absent a showing of an abuse of discretion. *Id.* An abuse of discretion occurs when the

juvenile court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual inferences that can be drawn therefrom. *Id.* Thus, the juvenile court is accorded wide latitude and great flexibility in its dealings with juveniles. *Id.*

[18] INDIANA CODE § 31-37-18-6 provides:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
>> (A) in the least restrictive (most family like) and most appropriate setting available; and
>>
>> (B) close to the parents' home, consistent with the best interest and special needs of the child;
>
> (2) least interferes with family autonomy;
>
> (3) is least disruptive of family life;
>
> (4) imposes the least restraint on the freedom of the child and the child's parent, guardian, or custodian; and
>
> (5) provides a reasonable opportunity for participation by the child's parent, guardian, or custodian.

[19] Under this statute, the juvenile court "is only required to consider the least restrictive placement *if* that placement comports with the safety needs of the community and the child's best interests." *J.B. v. State*, 849 N.E.2d 714, 717 (Ind. Ct. App. 2006) (citing I.C. § 31-37-18-6) (emphasis in original). "Thus, the statute recognizes that in certain situations the best interest of the child is

better served by a more restrictive placement." *K.A. v. State*, 775 N.E.2d 382, 387 (Ind. Ct. App. 2002), *trans. denied*.

[20] This case presents such a situation where a more restrictive placement was not an abuse of discretion. J.C., who has a history of juvenile delinquency, had already been given multiple opportunities in less restrictive placements even after committing multiple delinquent acts. Starting in July 2016, the juvenile court placed J.C. on probation following his theft adjudication. Even after J.C. admitted having committed additional delinquent acts in three separate causes in August, September, and October 2016, the juvenile court allowed J.C. to remain on probation with home detention and electronic monitoring. Then, in December 2016, after J.C. had violated home detention rules, the juvenile court continued to show J.C. leniency when it had him serve only five days in the Juvenile Justice Center and allowed him to continue on probation and home detention. Upon J.C.'s fifth delinquency petition in February 2017, the juvenile court ordered J.C. to be placed at Campagna Academy. Ultimately, J.C.'s behavior while in that residential placement resulted in a sixth delinquency petition and his removal from that placement and into placement at Damar. Upon J.C.'s return home from Damar, the probation department met regularly with J.C. and provided him with intensive outpatient services. Nevertheless, J.C. continued to act aggressively and eventually had another delinquency petition filed against him, alleging that he had committed domestic battery and intimidation. In its order modifying J.C.'s placement and awarding wardship of him to the Indiana Department of Correction, the juvenile court

noted the following reasons for the modification: (1) J.C. had "failed to abide by Court ordered terms of probation[;]" (2) J.C.'s "present offense [wa]s serious in nature warranting placement in a secure facility[;]" (3) J.C.'s "past history of delinquent acts warrant[ed] placement in a secure facility[;]" and (4) "[l]ess restrictive means of controlling [J.C.'s] behavior ha[d] been investigated or tried." (App. Vol. 3 at 98). Given the facts and circumstances of this case, the juvenile court did not abuse its discretion by modifying its disposition order and ordering the placement of J.C. with the Department of Correction. *See, e.g.*, *K.A.*, 775 N.E.2d at 387 (concluding that there was no abuse of discretion by the juvenile court when it modified the juvenile's disposition to commitment to the Department of Correction after the juvenile had failed to reform her behavior at other placements); *M.R. v. State*, 605 N.E.2d 204, 208 (Ind. Ct. App. 1992) (explaining that "[t]here are times in juvenile proceedings when the best interest of the juvenile and society require commitment" to a juvenile facility).

[21] Affirmed.

Bradford, C.J., and Baker, J. concur.